NEWSOM, Circuit Judge:
This criminal appeal presents both a surprisingly close question of evidentiary sufficiency-so close, in fact, that it has prompted a dissent-and an interesting statutory-interpretation issue. As to the former, federal law criminalizes the act of knowingly making a false statement in order to obtain a loan from a bank that is insured by the FDIC. 18 U.S.C. § 1014. Matthew Munksgard admits to knowingly making false statements in order to obtain bank loans-indeed, four times over. Even so, he contends, the government failed to show beyond a reasonable doubt, as it had to, that the institution he swindled was FDIC-insured. This case presents the (irritatingly familiar) question whether the government presented sufficient evidence to prove that pesky jurisdictional prerequisite. The proof of FDIC insurance here-as in other cases in which we have rapped the government's knuckles-was hardly overwhelming. And given the ease with which insurance coverage could have been demonstrated-certificate, contract, cancelled check, etc.-inexplicably so. Having said that, "overwhelming" isn't the standard, and when we view the evidence in the light most favorable to the government, as we must, see United States v. Frank , 599 F.3d 1221, 1233 (11th Cir. 2010), we conclude-albeit reluctantly-that the proof was adequate to demonstrate Munksgard's guilt beyond a reasonable doubt. But let this be a warning to federal prosecutors: You are (as the author's mother used to say) cruisin' for a bruisin'. Don't apologize-do better.
Now, the statutory-interpretation issue: Federal law makes it a crime for any person to "use[ ], without lawful authority, a means of identification of another person." 18 U.S.C. § 1028A(a)(1). The jury here found that Munksgard violated this statute when, in an effort to obtain financing *1330 to support his land-surveying business, he forged another person's name to a surveying contract that he submitted to a bank in support of his loan application. The question before us is whether Munksgard's conduct qualifies as a prohibited "use[ ]" within the meaning of § 1028A(a)(1). Munksgard insists that we should cabin the meaning of "use[ ]" to crimes in which the accused attempted to impersonate, or act "on behalf of," someone else. We disagree. Plain meaning, statutory context, and existing precedent all show that Munksgard "use[d]" his victim's means of identification when he employed that person's signature to obtain the loan and thereby converted the signature to his own service.
I
Matthew Munksgard began banking with Drummond Community Bank in the late 1990s. Drummond is a relatively small bank; at the time of trial, it operated in only a few counties in west central Florida. Munksgard obtained his first drawdown line of credit from Drummond in 2010 to fund his work as a land surveyor. After repaying that loan without incident, in 2012 Munksgard obtained two more drawdown lines. He also repaid those loans, albeit once from a different source of funds than he had indicated in his loan application.
That's when the real trouble started. The next year, Munksgard applied for yet another line of credit from Drummond, this time supported by a surveying contract with a company called Cal-Maine Foods. That contract showed the signature of Cal-Maine employee Kyle Morris. Munksgard now admits that the contract was fraudulent and that he signed Morris's name to it without Morris's knowledge or permission.
Munksgard obtained three more lines of credit from Drummond over the next two years. He supported a 2013 credit application with a contract with Maxwell Plum Creek signed, on Plum Creek's behalf, by an "S. Riggins." Plum Creek had no knowledge of the contract, and "S. Riggins" didn't exist. Munksgard's third and fourth credit applications, both in 2014, followed a similar pattern. To support them, Munksgard submitted contracts with St. Johns River Water Management and Triple Bell Farms. Both contracts were fraudulent, and both were signed by fictional employees-"Ross Rawlings" for St. Johns River and "Jason Hanold" for Triple Bell.
Three years and four unpaid loans in, Drummond started asking questions and ultimately contacted the FBI. A grand jury later indicted Munksgard on four counts of knowingly making a false statement in order to obtain a loan from an FDIC-insured bank, in violation of 18 U.S.C. § 1014, and one count of aggravated identity theft for his placement of Kyle Morris's signature on the Cal-Maine Foods contract, in violation of 18 U.S.C. § 1028A.
At trial, the government presented three pieces of evidence to prove that Drummond was FDIC-insured when Munksgard submitted the fraudulent materials: (1) a certification indicating that the bank's deposits were insured when it was initially chartered in 1990; (2) testimony from a veteran bank employee, David Claussen, that Drummond was currently (i.e. , in 2016) FDIC-insured; and (3) Claussen's further testimony that the bank isn't required to "renew[ ]" its FDIC certificate "every so often."
The jury convicted Munksgard on all five counts. The district court sentenced Munksgard to six months in prison for the fraudulent credit applications and to a consecutive 24 months for aggravated identity theft.
*1331 II
We begin with Munksgard's bank-fraud conviction under 18 U.S.C. § 1014. Section 1014 prescribes stiff penalties for anyone who "knowingly makes any false statement ... for the purpose of influencing in any way the action of any institution the accounts of which are insured by the Federal Deposit Insurance Corporation." 18 U.S.C. § 1014. For purposes of appeal, all agree that Munksgard (1) knowingly (2) made false statements (3) in order to obtain financing from Drummond Community Bank. That gets the government three-quarters of the way home. Munksgard contends, though, that the government didn't quite finish the job-in particular, he says, it failed to present sufficient evidence to prove beyond a reasonable doubt that Drummond was FDIC-insured at the time he submitted the fraudulent loan applications.
We've seen this play before-part comedy, part tragedy. For reasons that leave us mystified, in cases involving federally insured banks-bank robbery, bank fraud, etc.-the government continues to stub its toe in seeking to prove the seemingly straightforward, but nonetheless jurisdictionally "indispensable," element of FDIC insurance. See United States v. Platenburg , 657 F.2d 797, 799 (5th Cir. Unit A 1981). In our Circuit alone, the problem stretches back more than half a century. For the good of all involved, we'll pick up the story in 1978, when we (then part of the old Fifth) considered a bank-robbery case in which the government had presented evidence indicating that the institution at issue had been insured (1) ten years before the crime and (2) at the time of the trial. Citing our own precedent, as well cases from the Sixth, Seventh, and Eighth Circuits confronting the same question, we observed that "a jury can reasonably infer that an institution was federally insured on the date of a robbery if it is presented with evidence showing that the institution was insured both prior to that date and recently thereafter." United States v. Fitzpatrick , 581 F.2d 1221, 1223 (5th Cir. 1978) (citations omitted). We hastened to add, however-the proverbial shot across the bow-that "the government obviously could have done a much better job of proving the bank's insured status at the date of the crime." Id .
Two years later, in what would later be described as the "nadir of the acceptable level of proof," Platenburg , 657 F.2d at 800, we found-"[j]ust barely"-that a reasonable jury could conclude that the target bank was insured at the time of the offense based on evidence that it had FDIC insurance five years earlier. United States v. Maner , 611 F.2d 107, 110-112 (5th Cir. 1980). We deemed it "at least arguable" that the jury could indulge "the universal presumption ... that all banks are federally insured"-and further "that a reasonable jury could infer beyond a reasonable doubt that proof of the condition of insurance before the robbery, absent evidence to the contrary, suggests the continuation of that insurance." Id. at 110.
Once again-this time more vigorously-we expressed our annoyance. We emphasized our "difficulty comprehending why the Government repeatedly fails to prove this element more carefully since the Government's burden is so simple and straightforward," and we warned that "the Government had tread[ed] perilously close to reversal in th[at] case, and may soon find itself crossing the line from sufficiency to insufficiency." Id. at 112. Underscoring what we described as a "plague infecting United States Attorneys throughout the land," our opinion included a 760-word "digest" of cases in which appellate courts had considered whether the government had failed to shoulder its proof-of-insurance burden. More generously, we even offered suggestions for how the government *1332 could prove this "simple but indispensable fact"-a certificate of FDIC coverage spanning the date of the crime, an insurance contract, a cancelled check, etc. Id. at 112 n.2.
Our warnings went unheeded. In Platenburg , the government presented only a certificate of FDIC insurance that predated the offense by seven years-nothing more. Enough had finally become enough: "The day ha[d] come; the line from sufficiency to insufficiency ha[d] been crossed." 657 F.2d at 799.
So then, what of this case? Notwithstanding our sympathy for our dissenting colleague's exasperation, we don't think the line has been crossed here. The government's evidence of insurance, while not overwhelming, was sufficient to prove beyond a reasonable doubt that Drummond Community Bank was FDIC-insured. In one of the first cases to address the FDIC-insurance issue, we quoted Professor Wigmore for the following logico-evidentiary propositions: first , "[w]hen the existence of an object, condition, quality, or tendency at a given time is in issue, the prior existence of it is in human experience some indication of its probable persistence or continuance at a later period"; and second , "[s]imilar considerations affect the use of subsequent existence as evidence of existence at the time in issue." Cook v. United States , 320 F.2d 258, 259 (5th Cir. 1963) (citations omitted).[1] Thus, at least in some circumstances, evidence of either "prior" or "subsequent" insurance, even standing alone, can be adequate proof of coverage at the time of the offense.[2] Needless *1333 to say, we much prefer both-and contemporaneous evidence is even better.[3]
In any event, given our precedent, what the government presented here was good enough. First, the government introduced a certificate of FDIC insurance issued when Drummond Community Bank was initially chartered in 1990-evidence (in Wigmore's terms) of "prior existence." Second, David Claussen, Drummond's Senior Vice President and Chief Underwriter, testified that the bank was insured at the time of trial in 2016-"subsequent existence." Finally, when asked whether Drummond's FDIC certificate is renewed "every so often," Claussen-who had spent 25 years at the small bank, and was therefore likely to be familiar with its administration and operations-testified that it isn't. We think it clear that a reasonable jury could conclude that his testimony provides additional evidence-beyond mere prior and subsequent existence-that Drummond was insured in 2013 and 2014, when Munksgard submitted the fraudulent contracts.
* * *
Considering all of the evidence, the government proved beyond a reasonable doubt that Drummond Community Bank was insured by the FDIC both before and after Munksgard's offenses and that it didn't need to renew its insurance in the interim. Coupled with the "universal presumption ... that all banks are federally insured," Maner , 611 F.2d at 110[4] -and viewing the proof in the light most favorable to the government-we conclude that a reasonable juror could find that Drummond was insured by the FDIC on the dates of Munksgard's offenses.
III
Now, to Munksgard's conviction for aggravated identity theft under 18 U.S.C. § 1028A, which was based on his signing Kyle Morris's name to the fraudulent contract with Cal-Maine Foods. Section 1028A(a)(1) provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."
As with the fraud counts, all but one of the elements required to convict Munksgard under § 1028A are straightforward. First, § 1028A(a)(1) 's "during and in relation to" clause covers Munksgard's § 1014 offense. Among other crimes enumerated in "subsection (c)" of § 1028A is "any provision contained in this chapter [47] (relating to fraud and false statements) ...." 18 U.S.C. § 1028A(c)(4). Chapter 47, in turn, "contain[s]" § 1014, which forbids "knowingly mak[ing] any false statement" for the purpose (as relevant here) of obtaining financing from an FDIC-insured bank. Second, Munksgard does not dispute that he "knowingly" signed Morris's name to the contract. Third, § 1028 defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any-name ...." 18 U.S.C. § 1028A(d)(7)(A). So, it seems clear to us, "/s/ Kyle Morris" counts as a "means of identification." Finally, Munksgard admits *1334 that he signed Morris's name "without lawful authority." 18 U.S.C. § 1028A(a)(1).
That leaves the verb. The government also had to prove, as pertinent here, that Munksgard "use[d]" Morris's identity. Citing United States v. Berroa , 856 F.3d 141 (1st Cir. 2017), and United States v. Miller , 734 F.3d 530 (6th Cir. 2013), Munksgard insists that the term "use[ ]" in § 1028A"require[s] that the defendant attempt to pass him or herself off as another person or purport to take some other action on another person's behalf." Berroa , 856 F.3d at 156. Munksgard says that because he only signed Morris's name, and didn't try to impersonate Morris or otherwise act on his behalf, he didn't "use[ ]" Morris's identification.
We aren't persuaded. Rather, we find ourselves in agreement with the Sixth Circuit's recent (post- Miller ) decision in United States v. Michael , which held that a pharmacist had "used" a doctor's and patient's "means of identification"-even though he impersonated neither-when he included the doctor's National Provider Identifier and the patient's name and birthdate on a fraudulent insurance claim. 882 F.3d 624, 628 (6th Cir. 2018). Like the Michael court, we begin with the ordinary meaning of the term "use"-and, in particular, how standard English-language dictionaries define the verb "use" when employed in conjunction with a particular object, as in to "use[ ] ... a means of identification." In Webster's Second , for instance, to "use" an object is "[t]o convert [it] to one's service; to avail oneself of [it]; to employ [it]; as, to use a plow, a chair, a book." Webster's Second New International Dictionary 2806 (1944). Webster's Third likewise defines "use" vis-à-vis an object to mean "to put [it] into action or service"-e.g. , "whether he would ever [use] the tie she had given him." Webster's Third New International Dictionary 2523 (2002). In Oxford , more of the same: "take, hold, or deploy (something) as a means of accomplishing or achieving something; employ; [as in] she used her key to open the front door." Oxford Dictionary of English 1958 (3d ed. 2010). And as proof that "use" does not bear some idiosyncratic connotation in the legal context, we note that Black's too defines the verb form to mean "[t]o employ for the accomplishment of some purpose" or "to avail oneself of." Black's Law Dictionary 1776 (10th ed. 2014). On plain meaning alone, therefore, it seems clear to us that Munksgard "use[d]" a means of identification in that he "employed" Morris's name in order to procure a bank loan, and thereby "convert[ed]" Morris's name "to [his] service."[5]
Statutory context confirms this plain-meaning interpretation of the term "use[ ]"-at least as it pertains to a "means of identification." For starters, § 1028A(a)(1) criminalizes the knowing and unauthorized use of a means of identification "during and in relation to" certain enumerated felonies-one of which, again, is knowingly making a false statement to an FDIC-insured bank under 18 U.S.C. § 1014. As the Sixth Circuit explained in Michael , this "during and in relation to" language connotes causation: "The salient point," the court said, "is whether the defendant used the means of identification to further or facilitate the ... fraud."
*1335 882 F.3d at 628. Just as "[f]orging a doctor's signature to bolster" insurance claims "facilitated the health care fraud" in that case, so too forging Morris's name to bolster a loan application facilitated the bank fraud in this one. Id . at 629.
Ranging beyond the term's immediate surroundings, our reading finds additional support in § 1028A(c) 's statutory cross references-the various "uses" of means of identification that the prohibition covers. Along with § 1014 's "fraud and false statements" ( (c)(4) ), § 1028A also reaches, to take only the first five, "theft or public money, property or rewards" ( (c)(1) ), "false personation of citizenship" ( (c)(2) ), "false statements in connection with the acquisition of a firearm" ( (c)(3) ), and "mail, bank, and wire fraud" ( (c)(5) ). While these references may not foreclose an impersonation-based "on behalf of" reading, they also don't preclude-and on balance, we think they support-an interpretation of "use[ ]" that more broadly forbids one from "employ[ing]" or "convert[ing] to [his] service" another's name.
Lastly, we note that what precedent there is further reinforces our plain-language reading. Although this Court has not yet opined (in a published opinion) on the meaning of "use[ ]" in § 1028A,[6] we have found the word "use" in other criminal statutes to entail employing or converting an object to one's service. See, e.g. , United States v. Montano , 398 F.3d 1276, 1284-85 (11th Cir. 2005) (observing that a defendant "use[s] or carrie[s] a firearm" within the meaning of 18 U.S.C. § 924(c)(1)(A) when he "employ[s] the guns, avail[s] himself of the guns, derive[s] service from the guns, or receive[s] any other benefit from the guns"). The Supreme Court and our sister circuits have done the same. See, e.g. , United States v. Castleman , 572 U.S. 157, 170-71, 134 S.Ct. 1405, 188 L.Ed.2d 426 (2014) (holding that under 18 U.S.C. § 922(g)(9)"the word 'use' conveys the idea that the thing used ... has been made the user's instrument") (internal quotation marks and citations omitted); Konop v. Hawaiian Airlines, Inc. , 302 F.3d 868, 880 (9th Cir. 2002) (defining "use" in 18 U.S.C. § 2701(c)(2) to mean "to put into action or service, avail oneself of, employ"); United States v. Ramsey , 237 F.3d 853, 859 (7th Cir. 2001) (interpreting "use or attempted to use" in U.S.S.G. § 3B1.4"fairly broadly" in accordance with the definition in the Sixth Edition of Black's -"to avail oneself of; to employ; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end").
There is one loose end-well two, really. Aside from his general contention that "us[ing] a means of identification" necessarily entails impersonation, Munksgard offers a pair of more specific reasons why we shouldn't deem his action to be a covered "use" of Morris's name. We find neither compelling. First, Munksgard asserts that he "signed Morris's name to the surveying contract but did not take anything from Morris nor did he obligate Morris to do anything." But harm to the identity's true owner isn't an element of § 1028A(a)(1) ; accordingly, Munksgard's argument-even if true-provides him no defense. Second, Munksgard contends that "the use of Morris's name was incidental to the offense" because (he says) it didn't influence Drummond Community Bank's decision to provide financing. But again, Munksgard's position presupposes an element-something like reliance-that § 1028A(a)(1) doesn't require.
*1336 * * *
In sum, we conclude that the plain meaning of the term "use," particularly when understood in statutory context and in the light of relevant precedent, demonstrates that Munksgard unlawfully "use[d]" Kyle Morris's name within the meaning of § 1028A(a)(1).
IV
For the foregoing reasons, we hold (1) that the jury here could find beyond a reasonable doubt that Drummond Community Bank was FDIC-insured at the time of Munksgard's offenses, as required by 18 U.S.C. § 1014, and (2) that when Munksgard signed Kyle Morris's name to the fraudulent surveying contract he submitted in support of his loan application, he "use[d]" Morris's "means of identification" within the meaning of 18 U.S.C. § 1028A(a)(1). Accordingly, we affirm Munksgard's convictions and sentences.
AFFIRMED

The Dissent objects to our citation to Cook on the ground that the court there was reviewing only for plain error, whereas here we review Munksgard's sufficiency-of-the-evidence argument de novo . See Dissenting Op. at 1337-39. There are two problems. First, in its effort prove that "[t]he standard of review answers the question" and conclusively distinguishes Cook ,id. at 1338-39, the Dissent strains to make Cook say something it doesn't. In particular, the Dissent insists that the Cook court "was looking outside the judicial proceedings"-that is, to Wigmore's commonsense propositions that prior and subsequent existence imply current existence-"because it was required to do so under plain error review," and in particular under "[t]he fourth factor," which asks whether the alleged error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." Dissenting Op. at 1339 (quoting United States v. Hernandez , 906 F.3d 1367, 1370 (11th Cir. 2018) ) (emphasis added by the Dissent). In fact, though, the Cook court emphasized the third plain-error factor-whether the alleged error affected "substantial rights," Cook , 320 F.2d at 260 -so the hinge on which the Dissent's distinction of Cook swings turns out not to work. Second, and in any event, we mustn't forget while our sufficiency review here is de novo , it remains the case that Munksgard's conviction "must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." United States v. Frank , 599 F.3d 1221, 1233 (11th Cir. 2010) (quoting United States v. Chastain , 198 F.3d 1338, 1351 (11th Cir. 1999) ). It seems to us hardly controversial that a jury could reasonably consider what we have called Wigmore's "logico-evidentiary propositions"-coverage before + coverage after = coverage in between-in determining whether Drummond was insured when Munksgard swindled it.

The Dissent concedes as much-see Dissenting Op. at 1339-40 (approving of the propositions' application in Woolworth Co. v. Seckinger , 125 F.2d 97 (5th Cir. 1942) )-but asserts that applying Wigmore's propositions "makes little sense in a case like this," where the relevant condition may change over a brief period of time. Dissenting Op. at 1340-41. Fair enough: hypothetically, a bank could lose its insured status at midnight tonight, noon tomorrow, or as we write this sentence. But as a "nearly universal" matter, banks don't. Cook , 320 F.2d at 259. Munksgard bore the burden on appeal to demonstrate that it was unreasonable for a jury presented with evidence of Drummond's prior and subsequent insurance to conclude that Drummond was insured during the period in between. We have difficulty understanding how a jury determination that squares with common experience is unreasonable.

A little Google sleuthing presumably would have revealed that Drummond's FDIC insurance was (as it appears to be now) "Active." See Fed. Deposit Ins. Corp., BankFind (data as of Dec. 5, 2018).

To be clear, neither we nor the Maner court are taking official notice of a disputed fact so much as acknowledging the state of the world-an exercise that is necessarily part of any review of the reasonableness of a jury's decision. See Dissenting Op. at 1341-42.

As employed in § 1028A, the term "use" no doubt covers impersonations, but impersonations do not exhaust the term's meaning. Just as the Supreme Court in Smith v. United States, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), rejected the argument that combining "use" with "firearm" meant that the statute criminalized only using qua shooting , so here "us[ing] a means of identification" needn't refer exclusively to impersonations. See Michael , 882 F.3d at 627 (rejecting similar argument).

We note, however, that our reading comports with that in United States v. Lewis , 443 Fed. App'x 493, 495-96 (11th Cir. 2011) ("As the signature of an individual's name specifically identifies that individual, we conclude that forging another's signature constitutes the use of a 'means of identification.' ").