[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13426

_____

D.C. Docket No. 1:16-cr-00355-MHC-JSA-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DARIUS TAUREAN CALDWELL,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 24, 2020)

Before JORDAN, TJOFLAT and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Darius Caldwell appeals his convictions for five armed-

bank-robbery and firearm offenses arising from his armed robberies of: (1) a Noa

Bank branch in Doraville, Georgia, on August 24, 2016; and (2) a Bank of America ("BOA") branch in Smyrna, Georgia, on September 7, 2016. Caldwell contends that the district court erroneously denied his motions: (1) to suppress evidence of a BOA teller's out-of-court identification; (2) for judgment of acquittal on the BOA armed-robbery count; and (3) for a new trial based on the improper admission of DNA testimony. After review and with the benefit of oral argument, we affirm.

## I.  FACTUAL BACKGROUND

### A.    Noa Bank Robbery on August 24, 2016

The government proved the Noa Bank robbery by eyewitness testimony and videos and still images from surveillance cameras inside the Noa branch and a nearby store. On August 24, 2016, around 1:00 or 2:00 p.m., a black male wearing a cloth mask tied in the back entered the Noa branch. The robber pointed a handgun at the employees and customers, approached the teller with the handgun now aimed at the teller, ordered the teller to put money on top of the counter, and put the money into a bag. The robber was in the bank for approximately one minute and escaped on foot.

The eyewitnesses—the teller and two other employees—described the robber as short, providing heights between 5 feet 3 inches and 5 feet 8 inches. They provided no other details about the robber's race, build, clothing, bag, or

2

handgun.  One employee testified that the robber's hair was curly and black; another described the robber's mask as "dark"; yet another said the mask was green, khaki, and red, but admitted that she was not focusing on the mask's colors.

Assigned to the case, FBI Special Agent Matt Winn reviewed the surveillance videos and still images.  Agent Winn testified that: (1) the robber wore a dark gray, inside-out t-shirt, dark-colored pants or jeans, dark shoes, and a blue and white bandana covering his face; and (2) the robber carried a black or dark-colored bag, used a silver and black automatic handgun, and had a short afro and a high hairline.  The surveillance videos and still images confirmed these details.

The Noa Bank robber was not caught until another robbery occurred.

## B.    BOA Robbery on September 7, 2016

About two weeks later, the BOA Smyrna branch was robbed.  The government proved the BOA robbery by: (1) eyewitness testimony; (2) recordings of the 911 calls; (3) videos and still images from a surveillance camera inside the BOA branch; and (4) evidence about Caldwell's arrest near the robbery scene and within ten feet of a bag containing his bandana, wig, handgun, about $4,000, and a GPS tracker.

The modus operandi of the BOA robbery was the same as the Noa Bank robbery.  On September 7, 2016, at approximately 10:07 a.m., a black male entered the BOA branch and approached the teller, Kathryn Crist, who was with a

customer.  The man placed a bag on the counter, pointed a handgun at the customer's face and then at teller Crist's face, while standing only two feet away from Crist, and ordered Crist to put money in the bag.  Crist complied and placed over $3,000 in the bag along with a GPS tracking device.  The robber was in the bank for approximately one minute and escaped on foot.

At trial, Crist and her customer testified that the robber, a black male, wore a black or dark-colored, inside-out t-shirt with a Steelers' logo on it, blue jeans, a wig or something unnatural on his head, and a blue or blue and white bandana covering his face.  The surveillance video and still images confirmed these details.  Officers, who later reviewed the video and still images, testified that the robber's wig appeared to be in a dreadlock style and that his jeans had a white mark on the lower left calf.  Teller Crist focused on both the robber and his handgun pointed at her.  Crist testified that the robber was approximately 5 feet 9 inches tall with a slight-to-medium build.  The customer described the robber as "not a tall person." Crist and her customer testified, and the surveillance video and still images confirmed, that the robber's bag was black and that his handgun was silver/gray and black.

Police were already on the way when the robber entered the BOA branch because employees of a nearby State Farm office had called 911 after seeing a man with a handgun crouching in the bushes and facing the BOA branch.  The State

Farm employee who called 911 told the dispatcher that the man had "dreads"; was wearing a black shirt, blue jeans, and black shoes; and was putting on a blue bandana mask. At trial, the employee and her coworker testified to this same description, except that the employee did not mention the robber's "dreads," and her coworker stated that the robber's bandana was blue and white and that he appeared to be wearing a large wig. Based on the State Farm 911 call, the 911 dispatcher called the BOA branch and spoke with Crist. Crist told the 911 dispatcher that the robber was a black man; was about 5 feet 9 inches tall with a slight build; dressed in black and wore a blue bandana on his face; possibly wore a hat; and carried a black bag and a handgun. After the two calls, the 911 dispatcher gave police this description: a black male with "dreads," wearing a black t-shirt, blue jeans, black shoes, and a blue bandana over his face, carrying a black bag and a handgun.

The GPS tracker, which teller Crist dropped into the robber's bag, led officers to a cul-de-sac on Glen Pointe Way, located less than a quarter mile from the BOA branch. Approximately ten minutes after the robbery—with the help of a homeowner on the cul-de-sac who saw a man with a black bag in his backyard—the officers discovered Caldwell crouched on the side of a house on Glen Pointe Way.

At the time, Caldwell was wearing clothing that matched the robber's: a

5

black or dark-colored, inside-out Steelers t-shirt, jeans with a white mark on the rear of the left leg, and dark-colored shoes. According to one officer, Caldwell's eyebrows and forehead also matched the robber's.[1]

Between 10:18 and 10:20 a.m., Caldwell was detained, handcuffed, and placed into a patrol car. Around 10:31 a.m., the officers found a black bag hidden in the bushes approximately ten feet from where Caldwell was found crouching. Officers testified, and body camera footage and still images confirmed, that the bag contained a black dreadlock wig, a blue and white bandana fashioned into a mask, a loaded silver and black handgun, about $4,000, and a GPS tracker.

Detective William Turner drove teller Crist to where police had found Caldwell to conduct a show-up identification. Crist told Detective Turner that she had seen the robber's face only from the bandana up and did not know if she could give a "spot-on identification."

Around 10:35 to 10:40 a.m., officers removed a handcuffed Caldwell from another patrol car and faced him toward Crist. Crist could not remember whether the man was handcuffed. Crist confirmed to Detective Turner that Caldwell appeared to be the same sex, height, build, race, and skin tone as the robber, and

---

[1]While Caldwell did not have "dreads," the officers were not concerned because the "dreads" had appeared to be a wig. Although Caldwell had tattoos, and the dispatch description said nothing about tattoos, the surveillance video and still images did show "shading" on the robber's arms, albeit not clearly depicted tattoos.

wore a similarly dark-colored t-shirt, although Caldwell was not wearing a wig or anything on his head. While Crist could point out similarities between Caldwell and the robber, Crist could not positively identify him as the robber at that time.

Caldwell was 31 years old, 5 feet 8 inches tall, and 160 pounds with a slight-to-medium build. FBI Agent Winn immediately recognized Caldwell as the possible perpetrator of the Noa branch robbery two weeks prior. The FBI arrived and took custody of Caldwell. FBI agents sent evidence to the FBI lab for DNA testing, including the black bag and its contents (the bandana, wig, and handgun). The FBI retrieved DNA from Caldwell.

## C.    FBI Agent's Testimony

Based on the surveillance videos and still images, Agent Winn testified about the similarities between Caldwell (who was arrested for the BOA robbery) and the earlier Noa Bank robber. Caldwell and the Noa robber were the same sex, race, build, and height; had the same high hairline and short-cut hairstyle; wore similar clothing and a seemingly identical blue and white bandana; and used a similar looking black bag and silver and black automatic handgun. In both robberies, the robber carried his handgun in a "strange manner" by wrapping all four fingers and the thumb around the grip of the handgun, below the trigger guard, instead of placing the index finger on the trigger or on or above the trigger guard.

Erica Ames, an FBI forensic examiner and DNA analyst, also testified. In

7

her DNA report, Agent Ames compared Caldwell's DNA to the mixtures of DNA on the bandana, wig, and handgun recovered after the BOA robbery. Agent Ames explained that, from DNA comparisons, examiners can draw three types of conclusions: inclusion, exclusion, and inconclusive. FBI examiners generate a statistic—called a "likelihood ratio"—that "helps give weight to [their] conclusions." A likelihood ratio is "a mathematical comparison of two different explanations for the DNA evidence" that "supports the strength of the inclusion." FBI examiners also provide a verbal description of how strong the support for inclusion is at a given ratio.

Agent Ames testified that the bandana revealed a mixture of DNA from three males, and Caldwell was included as a possible contributor to that DNA mixture with a likelihood ratio of 700 billion. Because the likelihood ratio was so high, Agent Ames concluded that "Caldwell was the source of one of the contributors of the mixture from the bandana."

The wig revealed a mixture of male and female DNA from three individuals, and Caldwell was included as a possible contributor to that DNA mixture with a likelihood ratio of 480,000. Agent Ames concluded that there was "very strong support that Mr. Caldwell is a contributor to the mixture on the wig." The handgun revealed a mixture of male and female DNA from four individuals, and Caldwell was included as a possible contributor with a likelihood ratio of 4.6 million. Agent

8

Ames concluded that there was "extremely strong support that Mr. Caldwell is a contributor to the mixture from the . . . pistol."

Defense counsel extensively cross-examined Agent Ames on, among other things, her methods in calculating the likelihood ratios. Defense counsel introduced most of Agent Ames's case file, including her report, which similarly stated her conclusions. On re-direct, Agent Ames confirmed her conclusions as to each piece of evidence.

## D. FDIC Insurance

The government also introduced evidence of BOA's insurance with the Federal Deposit Insurance Corporation ("FDIC"). The government's witness was William Anderson, BOA's Vice President of Corporate Security for ten years and custodian of its FDIC records. Anderson testified that BOA had been FDIC-insured since 1999, that it was insured at the time of the September 7, 2016 robbery of the BOA branch, and that it was currently insured.

The government also admitted a copy of BOA's FDIC insurance certificate, a document that Anderson testified was maintained by BOA in the regular course of business. The certificate states that the FDIC certifies that:

> [T]he deposits of each depositor in
> BANK OF AMERICA, NATIONAL ASSOCIATION
> CHARLOTTE
> NORTH CAROLINA
> are insured to the maximum amount provided by the Federal Deposit
> Insurance Act.

9

The certificate was dated July 23, 1999, which Anderson said signified that BOA has been FDIC-insured since that date and was still in coverage. Anderson explained that BOA would have been notified if the FDIC canceled its insurance coverage after July 23, 1999, and that BOA never received any cancellation notice. Anderson further testified that BOA was required to make quarterly insurance payments to keep its FDIC coverage current, that BOA made those payments, and that its FDIC insurance has never lapsed.

On cross-examination, defense counsel attempted to establish that the FDIC certificate was for Bank of America, National Association ("BOA N.A.") only and did not cover individual BOA branches. However, Anderson testified that: (1) the FDIC certificate lists BOA N.A., the corporate headquarters located in Charlotte, North Carolina; (2) there are bank branches underneath BOA N.A., but the branches are not separately chartered; (3) the BOA N.A. charter covers all assets in its "consumer space, which would be [all] financial centers," i.e. all BOA branches; (4) all of BOA N.A.'s assets and branch institutions fall under its FDIC certificate; and (5) BOA would not be able to operate its branches otherwise.

On redirect, Anderson reiterated that BOA's FDIC insurance included the specific Smyrna BOA branch and testified that each branch does not have to obtain separate insurance. Anderson testified that he did not need any documentation other than the FDIC certificate to show that BOA's branches had FDIC insurance

10

coverage.  Anderson's testimony, including that all BOA branches were covered, was based on his personal knowledge and experience at the bank and information provided by the FDIC.

The government also introduced evidence of Noa Bank's FDIC-insured status, including its FDIC certificate for "NOA BANK DULUTH GEORGIA."[2] Judy Allen, Noa's FDIC compliance manager and records custodian, testified that the FDIC certificate was issued to Noa Bank as a corporation, headquartered in Duluth.  Allen stated that the FDIC insurance for Noa Bank applied to all its branches, including the Doraville branch.  Allen explained that, in general: (1) FDIC insurance "is provided to the bank itself" as a corporation (whether it "ha[s] five branches or twenty-five branches") and "covers all the deposits of the bank"; (2) FDIC certificates "do[] not expire" and "do[] not have to be renewed" once issued; and (3) FDIC certificates "stay[] in effect unless . . . revoked by the FDIC."  While Noa Bank's FDIC certificate was issued in 2008, Allen testified that it was still in effect at the time of the August 24, 2016 robbery of the Noa branch.

---

[2]On appeal, Caldwell does not challenge the sufficiency of the FDIC-insured evidence as to the Noa branch.  Further, at trial, Caldwell stipulated that, as of September 7, 2016, he was a convicted felon.

## II.  PROCEDURAL HISTORY

### A.    Indictment

In January 2018, a superseding indictment charged Caldwell with: (1) two counts of armed bank robbery, in violation of 18 U.S.C. § 2113(a) and (d) (Counts 1 (Noa Bank) and 3 (BOA)); (2) two counts of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 942(c) (Counts 2 and 4); and (3) one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 5).

### B.    Motion to Suppress Crist's Identification Testimony

Caldwell moved to suppress any identification testimony based on BOA teller Crist's out-of-court identification.  He asserted any such testimony was tainted by an unduly suggestive and unreliable show-up identification procedure. At a hearing on the motion, the government called Crist, Detective Turner, Agent Winn, and two other officers to testify regarding the robber's description, the police's arrest of Caldwell and discovery of the bag, the show-up procedure, and the officers' review of the surveillance videos and still images.  The witness testimonies at the hearing largely matched those at trial.  The government and Caldwell then filed post-hearing briefs.

In a report, the magistrate judge recommended that Caldwell's motion to suppress be denied because the identification process was not unduly suggestive,

and, in any event, the identification was still sufficiently reliable.  The magistrate judge highlighted that Crist had close visual contact with the robber, the show-up occurred just over 30 minutes later, Crist explained the basis of her identification, her description of the robber matched Caldwell, Crist acknowledged that she could not see the robber's entire face, and she identified Caldwell based on other characteristics she observed.  Over Caldwell's objections, the district court adopted the magistrate judge's recommendation and denied Caldwell's motion to suppress.

## C.    Jury Trial, Rule 29 Motion, and Convictions

After three days of evidence, the government rested, and Caldwell moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  Caldwell argued, inter alia, that there was insufficient evidence that: (1) he was the robber in either the Noa or BOA robbery; or (2) the BOA branch was FDIC-insured at the time of the robbery.  The district court denied the Rule 29 motion.  Presenting no evidence, the defense rested.  The jury found Caldwell guilty of all five charges.

## D.    Sentencing

The district court determined that Caldwell's total offense level of 24 and criminal history category of VI yielded an advisory guidelines range of 100 to 125 months' imprisonment on the two armed-robbery convictions in Counts 1 and 3 and the felon-in-possession conviction in Count 5.  The firearm-brandishing conviction in Count 2 carried a mandatory consecutive term of 7 years'

13

imprisonment. The second firearm-brandishing conviction in Count 4 carried a mandatory consecutive term of 25 years' imprisonment.

The district court sentenced Caldwell to: (1) one day of imprisonment on the armed-robbery and felon-in-possession convictions, to be served concurrently; (2) 84 months on the first firearm-brandishing conviction, to be served consecutively to all other counts; and (3) 300 months on the second firearm-brandishing conviction, to be served consecutively to all other counts. On appeal, Caldwell does not challenge his sentence.

### E.    Motion for New Trial

In November 2018, while Caldwell's appeal was pending, the defense received a letter from the FBI disclosing issues with Agent Ames's testimony regarding the likelihood ratios as to the wig and handgun. The disclosure stated that Agent Ames deviated from the recommended language for describing the meaning and significance of likelihood ratios when discussing the likelihood ratios for: (1) the wig on direct examination; (2) the handgun on redirect examination; and (3) a hypothetical case on direct examination. For example, Agent Ames testified that "the DNA profile from the wig is 480,000 times more likely that Mr. Caldwell and two unknown, unrelated individuals are contributors as opposed to originally from three unknown individuals." However, she should have stated that "the DNA profile from the wig is 480,000 times more likely if Mr. Caldwell and

14

two unknown, unrelated individuals are contributors as opposed to if they originated from three unknown individuals." The disclosure stated: "This subtle difference technically changes the meaning."

Caldwell moved for a new trial, pursuant to Federal Rule of Criminal Procedure 33(a), based upon the "newly discovered evidence" that Agent Ames "had testified erroneously regarding the likelihood that [] Caldwell was a contributor of DNA to the handgun . . . and the wig."[3]

The district court denied Caldwell's motion for a new trial. The district court catalogued all of the non-DNA evidence against Caldwell and found that "the jury had overwhelming non-DNA evidence that Caldwell robbed the Bank of America" and "significant non-DNA evidence that Caldwell also robbed the Noa Bank." The district court concluded that the newly discovered evidence did not affect the outcome of the trial and would not probably produce a new result. This is Caldwell's appeal.

### III. MOTION TO SUPPRESS

Caldwell argues that the district court erroneously denied his motion to suppress the identification evidence obtained from Detective Turner's show-up

---

[3]There were no deviations as to the bandana, and Caldwell does not challenge Agent Ames's testimony in that regard. Agent Ames's explanation for that item was simply that a likelihood ratio of 700 billion was high enough to conclude that Caldwell was the source of one of the contributors of the DNA mixture.

15

procedure with BOA teller Crist.[4]

"This Court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification." United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001). We must consider: (1) "whether the original identification procedure was unduly suggestive"; and, if so, (2) "whether, under the totality of the circumstances, the identification was nonetheless reliable." Id. To determine the identification's reliability, we consider: (1) the eyewitness's opportunity to view the suspect; (2) her degree of attention; (3) the accuracy of her description; (4) her level of certainty; and (5) the length of time between the crime and her identification. Id. (citing Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382 (1972)).

Here, even assuming the show-up identification was unduly suggestive, the district court did not clearly err in alternatively finding that the identification was sufficiently reliable.[5] First, even if only for less than a minute, BOA teller Crist

---

[4]When reviewing the denial of a motion to suppress evidence, this Court reviews the district court's factual findings for clear error and its legal rulings de novo. United States v. Laist, 702 F.3d 608, 612 (11th Cir. 2012). In doing so, we construe the facts in the light most favorable to the party that prevailed below—here, the government. Id. We will not overturn a district court's factual findings unless "our review of the record leaves us with the definite and firm conviction that a mistake has been committed." United States v. White, 335 F.3d 1314, 1319 (11th Cir. 2003) (quotation marks and citation omitted). At trial, Crist made no in-court identification. The issue on appeal is Crist's out-of-court identification.

[5]Caldwell's arguments largely focus on the first prong of the two-step analysis: that show-up identifications are "inherently suggestive" and that the officers aggravated the suggestiveness of the identification. Because the district court did not clearly err in finding that

16

had close visual contact with the robber, who was only two feet away and separated by only the counter. Second, Crist testified that she was focused on the robber (as well as the handgun) during the robbery. Her detailed description of the robber confirms her focus on the robber's appearance.

Third, Crist's description of the robber—a black male, approximately 5 feet 9 inches tall with a slight-to-medium build, wearing a black or dark-colored, inside-out t-shirt with a Steelers' logo on it and blue jeans—matched Caldwell's appearance at the time of his arrest. Crist's further descriptions—that the robber wore a wig or something unnatural on his head, covered his face with a blue bandana, carried a black bag, and used a black and silver/gray handgun—also matched the black bag and its contents that officers found less than ten feet from Caldwell upon arrest. Crist's description of the robber also matched the robber's appearance in the surveillance video and still images, as well as descriptions by other eyewitnesses and officers.

Fourth, although teller Crist testified that she could not positively identify Caldwell as the robber at the show-up, she was able to confirm that he appeared to be the same sex, height, build, race, and skin tone as the robber, and that he wore a similarly dark-colored t-shirt. Fifth, Crist's show-up identification of Caldwell

---

teller Crist's identification was nonetheless reliable, we need not, and do not, address whether or not the show-up identification here was unduly suggestive.

17

occurred just over 30 minutes after the robbery.  Accordingly, almost all the Neil factors weigh heavily in favor of the reliability of Crist's identification.  See Neil, 409 U.S. at 199-200, 93 S. Ct. at 382; Diaz, 248 F.3d at 1102.

Moreover, while Caldwell focuses on a handful of shortcomings in Crist's identification, defense counsel thoroughly cross-examined Crist on these matters at trial.[6]  The rest was for the jury to weigh and decide.  See Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968) ("The danger that use of the [pretrial identification] technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error.").

Based on the totality of the circumstances and our consideration of the Neil factors, we conclude that the district court did not clearly err in finding that teller Crist's identification was sufficiently reliable and in allowing the government to introduce Crist's out-of-court show-up identification.  See Diaz, 248 F.3d at 1102.

## IV.  MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT 3

Next, Caldwell contends that the district court erred in denying his motion

---

[6]Namely, Caldwell challenges: (1) Crist's less-than-one-minute opportunity to view the robber, who was masked and stood behind a tall counter; (2) Crist's degree of attention to the robber's face since she was also looking at the handgun and/or down at the register; (3) the details of Crist's description, only some of which related to immutable characteristics; (4) the lack of certainty in Crist's identification; and (5) Crist's far distance from Caldwell at the show-up.  Defense counsel's cross-examination of Crist revealed to the jury the majority of these "shortcomings."

18

for a judgment of acquittal as to Count 3 because the government failed to prove that the BOA branch was FDIC-insured at the time of the September 7, 2016 robbery.[7]

"To establish federal jurisdiction and to prove a violation of [§] 2113, the Government must show that the bank was insured by the FDIC at the time of the robbery." United States v. Maner, 611 F.2d 107, 108 (5th Cir. 1980).[8]  Over the past fifty years, this Court has accepted "sparse" FDIC-insurance evidence from the government as sufficient.  See United States v. Brown, 616 F.2d 844, 848 (5th Cir. 1980) (listing cases and explaining that, while, "[a]s in a number of cases decided by this Court, the government's proof of federal insurance was sparse," "[s]parse evidence . . . can be enough").

Ideally, the government would proffer proof of contemporaneously held FDIC insurance, or at least FDIC insurance held both before and after the time of the offense.  United States v. Munksgard, 913 F.3d 1327, 1332-33 (11th Cir. 2019).  However, "[i]n Cook v. United States, 320 F.2d 258 (5th Cir. 1963), we set a low threshold of proof of insurance for appellate review."  Maner, 611 F.2d at

---

[7]This Court reviews de novo the denial of a Rule 29 motion for judgment of acquittal. United States v. Albury, 782 F.3d 1285, 1293 (11th Cir. 2015).  "When the sufficiency of the evidence is challenged, we view[] the evidence in the light most favorable to the verdict, and draw all reasonable inferences and credibility choices in the verdict's favor."  Id. (quotation marks omitted).

[8]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

19

109. In each case after Cook, we have found the government's evidence to be sufficient. Id. For example, in Maner, the government introduced: (1) a copy of the bank's FDIC certificate issued five years before the offense; (2) a bank officer's testimony that the certificate was a record maintained under his supervision in the bank's regular course of business; and (3) another employee's testimony that he had seen a 15-year-old certificate in the bank vault and copies of that certificate posted on each teller's window. Id. at 108. The Fifth Circuit held that the government's proof of FDIC insurance was "just barely" sufficient. Id. at 112.

Soon thereafter, the Fifth Circuit determined that, "[i]n Maner, we reached the nadir of the acceptable level of proof." United States v. Platenburg, 657 F.2d 797, 800 (5th Cir. 1981). In Platenburg, the government introduced solely a copy of the bank's FDIC certificate issued seven years before the offense, nothing more. Id. The Fifth Circuit's prior decisions upholding the adequacy of the evidence usually had the FDIC certificate—even if not always current—as well as the testimony of bank officials—even if "less than conclusive as to the insured status at the time of the illegal acts." Id. at 799-800. Because the seven-year-old certificate was unaccompanied by any evidence that it was still current, the Fifth Circuit held that the government had finally crossed the line from sufficiency to insufficiency. Id. at 799.

20

More recently, in Munksgard, the government introduced: (1) a copy of the bank's FDIC certificate issued in 1990, over 20 years before the offenses; (2) a bank employee's testimony that the bank was currently FDIC-insured at the time of trial in 2016; and (3) that same employee's testimony that he worked at the small bank for 25 years and the bank was not required to renew its FDIC certificate "every so often."  913 F.3d at 1330, 1333.  This Court determined that, "given our precedent, what the government presented here was good enough" because it provided (1) "prior existence" of FDIC insurance in 1990, (2) "subsequent existence" of FDIC insurance in 2016, and (3) testimony about how the bank did not need interim renewals that provided additional evidence that the bank was insured at the time of the 2013 and 2014 offenses.  Id. at 1333.  Viewing this proof in the light most favorable to the verdict, "[c]oupled with the 'universal presumption [from Cook] that all banks are federally insured,'" this Court concluded that a reasonable juror could find beyond a reasonable doubt that the bank was FDIC-insured on the dates of the offenses.  Id. (quoting Maner, 611 F.2d at 110).

Significantly, here, there was more evidence than in Munksgard and Maner. For sure, the government introduced a copy of BOA N.A.'s FDIC certificate issued in 1999, 17 years before the 2016 robbery.  But the government also called two witnesses: (1) Anderson, who had been BOA's Vice President of Corporate

21

Security for ten years and was familiar with its administration and operations; and (2) Allen, who was Noa's FDIC compliance manager and records custodian. Anderson testified that: (1) BOA N.A.'s FDIC certificate was a record maintained under his supervision in BOA's regular course of business; (2) that FDIC certificate covered all BOA financial centers and branches, including this BOA branch; (3) there was no requirement for each branch to obtain separate FDIC insurance; (4) BOA was FDIC-insured at the time of the 2016 robbery; (5) BOA was current on its quarterly payments to maintain its insurance; (6) there was no indication that BOA's insurance had ever lapsed; (7) BOA never received a cancellation notice; and (8) BOA was currently covered by its FDIC certificate at the time of trial in 2018.  Similarly, Allen testified that, in general: (1) FDIC insurance is provided to the bank itself as a corporation and covers all the bank's deposits; (2) FDIC certificates do not expire and do not need to be renewed once issued; and (3) FDIC certificates stay in effect unless and until revoked.

Given all of this evidence, viewed in the light most favorable to the government, "[c]oupled with the 'universal presumption . . . that all banks are federally insured,'" a reasonable jury could find beyond a reasonable doubt that the BOA branch was FDIC-insured at the time of the 2016 robbery.  See Munksgard, 913 F.3d at 1330-33; Maner, 611 F.2d at 108, 110, 112.

Contrary to Caldwell's arguments, the bases of Anderson's personal

22

knowledge were fleshed out at trial, revealing his ten years as BOA's Vice President of Corporate Security, his additional role as FDIC records custodian, and his institutional knowledge of BOA's FDIC history and records. Defense counsel thoroughly cross-examined Anderson on the bases of his personal knowledge and even elicited Anderson's concession that he did not bring to trial any other documents supporting the BOA branch's coverage in 2016. Any discrepancies in Anderson's testimony would be "for the jury to resolve." See Maner, 611 F.2d at 110 ("Once the evidence was properly before them, the conclusions to be drawn from the evidence were for the jury to make."). Both Anderson and Allen testified a bank's FDIC certificate is provided to the bank/corporation itself and applies to all branches.

Caldwell also ignores that there was more evidence in his case than in Munksgard. See 913 F.3d at 1330, 1333. In Munksgard, the government's evidence—beyond prior and subsequent existence of FDIC insurance—was solely testimony that the bank did not need interim renewals of its FDIC certificate. See id. In contrast, here, the government's evidence went much further than that in Munksgard. The government introduced Anderson's and Allen's testimonies that FDIC certificates generally do not expire and do not need to be renewed, BOA was current on its quarterly payments to maintain its FDIC insurance, and there was no indication of any cancellation of or lapse in BOA's FDIC coverage.

23

Anderson also expressly testified that BOA was FDIC-insured at the time of the 2016 robbery.[9]

For all of these reasons, the district court did not err in denying Caldwell's Rule 29 motion for judgment of acquittal on Count 3.

## V.  MOTION FOR NEW TRIAL

Caldwell also challenges the district court's denial of his motion for a new trial based on the "newly discovered evidence" showing three instances in which Agent Ames's DNA testimony deviated from the FBI's recommended language regarding likelihood ratios.

Upon a defendant's Rule 33 motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  To show entitlement to a new trial based on newly discovered evidence, a movant must establish that: (1) the evidence was discovered after trial; (2) the movant's failure to discover the evidence was not due to his lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is of such a nature that a new trial would probably produce a

---

[9]Without acknowledging this Court's binding decisions in Cook, Maner, and Munksgard, Caldwell cites a Sixth Circuit decision.  See United States v. Sandles, 469 F.3d 508 (6th Cir. 2006).  Unlike the Sixth Circuit case, the government here introduced testimony—beyond prior and subsequent existence of insurance—that BOA's FDIC certificate had not lapsed or expired, did not need to be renewed, and was still in effect at the time of the 2016 robbery.  Not only is this evidence sufficient under our Circuit's binding precedent, but it also appears to be sufficient under the Sixth Circuit's Sandles case.

different result.  United States v. Stahlman, 934 F.3d 1199, 1230 (11th Cir.), cert. denied, __ U.S. __, 140 S. Ct. 530 (2019).  In evaluating a Rule 33 motion, while "a district court may weigh the evidence and consider the credibility of the witnesses," it "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable."  Butcher v. United States, 368 F.3d 1290, 1297 (11th Cir. 2004) (quotation marks omitted).  Rather, to grant a Rule 33 motion, the evidence must "preponderate[] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."  United States v. Albury, 782 F.3d 1285, 1295 (11th Cir. 2015) (quotation marks omitted).

The district court found that Caldwell failed to meet the fifth prong.  We agree, which obviates our need to consider the other four prongs.  Specifically, Caldwell has not shown that the new evidence about Agent Ames's testimony on likelihood ratios would probably produce a different outcome.  See Stahlman, 934 F.3d at 1230.  For starters, those three deviations did not impact other aspects of Agent Ames's testimony.  Even without the likelihood ratios, Agent Ames opined that Caldwell was a contributor to the DNA mixtures on the bandana, wig, and handgun; that he was in fact the source of the DNA on the bandana; and that there was "very strong support" and "extremely strong support" that he was a contributor on the wig and the handgun, respectively.  Caldwell does not challenge

25

these opinions.  Thus, even without the likelihood ratios, Agent Ames provided other measures from which the jury could conclude that Caldwell's DNA was on the bandana, wig, and handgun.

Additionally, as the district court found, there was ample non-DNA evidence supporting Caldwell's guilt as to both robberies.  Even without the DNA evidence, the jury had overwhelming evidence that Caldwell was the robber of the BOA branch.  Indeed, about ten minutes after the robbery, the GPS tracker led law enforcement to the cul-de-sac where Caldwell was found hiding behind a home less than a quarter mile from the BOA branch and about ten feet from a black bag containing the bandana, wig, handgun, money, and GPS tracker.

Further, according to eyewitness and law enforcement testimony, surveillance video, and still images, Caldwell's physical characteristics and clothing matched those of the BOA robber—a black male who was 5 feet 8 inches tall and 160 pounds with a slight-to-medium build; wore a black or dark-colored, inside-out t-shirt with a Steelers' logo on it, blue jeans with a white mark on the rear of the left leg, and dark-colored shoes; and had a high hairline.  This same evidence showed that Caldwell's bag and its contents also matched those of the robber—a black bag containing a dreadlock wig, a blue and white bandana fashioned into a mask, a loaded silver and black handgun, about $4,000 in currency, and the GPS tracker that led the police to him.  While Caldwell did not

26

have "dreads," that discrepancy was explained by the dreadlock wig in his bag. And while eyewitnesses did not mention Caldwell's tattoos and the surveillance video and still images did not clearly show tattoos, the remaining matching characteristics, as well as the GPS tracking and the physical items found ten feet from him, heavily outweigh this discrepancy.

Likewise, even without the DNA evidence, the jury also had more than ample evidence that Caldwell was the robber of the Noa branch. To begin with, the surveillance videos and still images showed that in both robberies the robber was a black male with a similar build, height, and high hairline. More importantly, there were other critical similarities in the robber's clothing, handgun, bag, and modus operandi. In fact, in both robberies, the robber: (1) wore a dark-colored, inside-out t-shirt, dark-colored pants or jeans, and dark shoes; (2) covered his face with a blue and white bandana; (3) carried a black or dark-colored bag; (4) used a silver and black automatic handgun that he held in a strange manner, by wrapping all four fingers and the thumb around the grip of the handgun, below the trigger guard; and (5) entered the branch, walked right to the counter, pointed his handgun at the teller, demanded money, had the money placed in his black bag, and escaped on foot less than one minute later.[10]  The physical evidence found after the BOA

---

[10]Although the Noa robber did not wear a dreadlock wig, he had a short-cut hairstyle that matched Caldwell's hairstyle upon arrest (after he was no longer wearing the dreadlock wig).

27

robbery was consistent with the video, still images, and descriptions of the t-shirt, bandana, bag, and handgun present in the Noa Bank robbery. Given the strong proof that Caldwell was the BOA robber, these similarities, along with the videos and still images, proved Caldwell robbed the Noa branch too.

In sum, even without the DNA evidence,[11] the jury had more than sufficient evidence that Caldwell robbed both the BOA and Noa branches. Accordingly, the district court did not abuse its discretion in denying Caldwell's Rule 33 motion for a new trial.

## VI. CONCLUSION

Caldwell has not shown that the district court erred, clearly erred, or abused its discretion in denying his motions to suppress, for a judgment of acquittal, or for a new trial. We affirm Caldwell's convictions.

**AFFIRMED.**

---

[11]We recognize the district court found the DNA evidence was not merely cumulative. Nevertheless, we point out that the DNA evidence tended to show solely that Caldwell's DNA was on the bandana, wig, and handgun, but those three items were found in the black bag ten feet from Caldwell upon his arrest ten minutes after the BOA robbery. The time sequence and physical proximity of those items to Caldwell alone sufficiently showed that those three items were Caldwell's and were used by him in that robbery. Thus, to some extent, the DNA evidence was cumulative.