[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13590

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

THOMAS DANIELS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20138-RNS-1

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

On a February evening in 2020, Thomas Daniels entered a tow yard, pointed his gun at two people living on the property, and demanded their possessions. Daniels then shot both victims, took their jewelry, car keys, and five dollars, and used the keys to unlock and drive off in the couple's Honda Civic. Shot, robbed, bleeding, and left for dead, the victims were eventually airlifted to the hospital and survived. After a five-day trial, a jury convicted Daniels of (1) carjacking resulting in serious bodily injury, (2) brandishing and discharging a firearm in furtherance of the carjacking, and (3) being a felon in possession of ammunition. The court sentenced him to more than forty years in prison.

Daniels appeals, challenging his convictions on evidentiary and suppression grounds. We are unpersuaded. The district court committed no error in excluding a defense expert who was offered to testify on the reliability of eyewitness identification; in admitting one victim's out-of-court identification testimony; in admitting a detective's testimony identifying Daniels in the tow yard surveillance footage; nor in failing to suppress photographs taken of Daniels after the crime. Accordingly, we affirm Daniels' convictions.

**I.**

In early 2020, Raynold Perez Irizarry and his partner, Omar Roman, relocated from New York to South Florida. The couple moved into an RV parked in a Homestead, Florida tow yard, which

was owned by one of Roman's friends.  They brought with them Perez's 2010 Honda Civic.

On the evening of February 14, 2020, Perez and Roman got into an argument with one another right outside the tow yard. Eventually, the fight turned physical, and the fight continued as they entered the tow yard.  Amid their altercation, a man entered the tow yard with a gun and approached them.  Roman noticed the man -- later identified as Thomas Daniels -- and asked him, "What are you doing here?  You need to get out of the yard."  The man revealed his pistol, said, "I am going to shoot you," and demanded that they "[g]ive [him] everything that [they] have."

With his hands up, Roman turned around to gather his belongings, but the man shot him anyway.  The bullet entered Roman's spine and exited through his face.  In the moment, Roman was "[p]aralyzed complete[ly]" and "[d]ropped . . . to the floor." The shooter "yanked the chain" from around Roman's neck, took his bracelet, "checked [his] pockets, checked everything," while Roman "played dead."

Believing his partner dead, Perez ran for his life.  Roman was not dead, but was unable to move, laying on the ground, bleeding, and could only watch helplessly as the man chased Perez through the tow yard and shot him twice from behind.  One bullet struck about two centimeters from Perez's spinal cord, and the other bullet hit his lung.  After sustaining the second shot, Perez stopped running.  The shooter then aimed the pistol at Perez's head and demanded his belongings.  Perez handed over his Versace chain,

car keys, and five dollars.  The shooter got into the Honda Civic and sped off.

Perez went to Roman and found him alive but still immobile.  Perez could not find his cell phone, so he picked up a phone lying near Roman to call 9-1-1.  Upon realizing it was not Roman's phone, he threw it down.  Desperate to find help, Perez got into a tow truck in the yard, drove it a short distance, and "parked in the middle of the street" with the intention of forcing "cars [to] stop because [he] was in the middle of the street, and then [he] could ask for help."  Eventually, a car stopped to help.

When the police arrived, Perez was "moaning in pain" and "very pale."  Officers also discovered Roman.  Both were airlifted to Ryder Trauma Center at Jackson Memorial Hospital in Miami.

While Roman and Perez received treatment in the hospital, law enforcement began to investigate the crime.  The investigation quickly yielded Thomas Daniels, a thin Black male then in his early twenties, as a suspect.  On February 15, 2020 -- the day after the shooting -- a man entered a local pawnshop with the victims' jewelry and, when asked for identification to complete the pawn transaction, handed over a license reading "Thomas Daniels."  Separately, law enforcement officers reviewed surveillance footage from the tow yard, and upon his review, Detective Christopher Wilson "immediately identified" Daniels as the shooter.  "The video [wa]s clear as day" and showed the shooter "running with the firearm and, you know, approaching the camera," so the

viewer could "clearly see his facial features, his entire face on video."

Detective Wilson, in fact, had great familiarity with Daniels, whom Wilson had met through "community involvement" efforts he had engaged in as a patrol officer. Wilson explained that there were "numerous occasions where [Daniels] would be a part of those groups where I get out of my patrol vehicle and, you know, throw around the football, shoot hoops, and just converse with them." Detective Wilson had known Daniels "for a number of years," knew Daniels' nickname, knew Daniels' brother, and had watched Daniels' "appearance change throughout the years." He had seen Daniels "over ten times" in the community without speaking to him, had spoken to Daniels one-on-one "seven to ten times," and knew "what area [Daniels] frequented" and "where he kind of hung out." Before the night of the crime in early 2020, Wilson had seen Daniels as recently as "sometime in late 2019" and "[s]everal times throughout 2019."

With Daniels as a suspect, law enforcement included his photo in a six-pack photo array to be shown to the victims in the hospital. When Perez was shown the lineup on February 16, he hesitated between two men, one of whom was Daniels, but ultimately no identification was made. Law enforcement's attempts to meet with Roman at that time were stymied by hospital staff who insisted that the officers return the following day because Roman was still recovering and "was not alert or coherent."

Meanwhile, Detective Wilson thought that the photo of Daniels in the array did not accurately reflect his current appearance, so, upon the advice of officers leading the investigation, he sought "to locate Thomas Daniels in an attempt to get a better picture" to use in the lineup.  On February 17, from approximately 25 yards away while driving around "an area known that [Daniels] frequented most of the time," Detective Wilson located Daniels "walking into the M&M Food Market" in Florida City.  When Detective Wilson spotted Daniels, Daniels "had the hoodie with his head slightly down," and Wilson saw only "the side of his facial features walking inside of the store."

Detective Wilson entered the store and found Daniels.  So as not to "alert [Daniels] that we . . . know he was the one who committed this crime," Detective Wilson did not draw his weapon and instead created a ruse for them to speak.  Wilson told Daniels, "I'm currently investigating a domestic dispute where a gentleman that's matching your description just battered his girlfriend. . . . Do you mind walking outside with me so we can talk about it?"  Daniels agreed, letting out a "sigh of relief" and becoming "calm."  Detective Wilson asked for permission to take some photographs of Daniels to help clear up the "domestic dispute" incident.  Daniels "very cooperative[ly]" agreed, "knowing that he just didn't batter his girlfriend" because "he doesn't even have a girlfriend," and posed for four photos "directly outside" the food market.  At no point was Daniels placed in handcuffs.  The entire encounter lasted "less than five minutes," and Daniels went "on his way after this"

encounter. Wilson shared the photographs with the investigation team.

Later that day, and with the benefit of an up-to-date photo of Daniels, a different law enforcement officer, Sergeant Reyes, displayed the modified six-person photo array to Roman, who was well enough to meet with the officer. Reyes read Daniels the admonition written under the photo array, which among other things, cautioned that the "group of photographs may or may not contain a picture of the person who committed the crime." Roman pointed to the photo of Daniels, told the officer, "This is the person that shot and robbed me," and asked him to "[g]et that mother f---ker."

A criminal complaint and a federal arrest warrant were issued for Daniels. After attempting to evade custody by changing his hairstyle and hiding out in an apartment near Brownsville, Daniels was arrested by a ten-officer special undercover team. The case against Daniels continued to tighten around him: several of the contacts saved to the cell phone discovered at the crime scene matched names and numbers Daniels later saved to his prison phone call system.

The district court split the trial into two phases, trying the felon-in-possession charge only after the jury had reached verdicts on the other charges first. The jury convicted Daniels of carjacking, in violation of 18 U.S.C. § 2119(2); brandishing and discharging a firearm in furtherance of the carjacking, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (iii); and possession of ammunition by a

convicted felon, in violation of 18 U.S.C. § 922(g)(1). In light of his extensive prior criminal history and the seriousness of the offenses of conviction, the district court sentenced Daniels to 485 months' imprisonment, the high end of the guideline range, followed by three years of supervised release. Daniels timely appealed.

## II.

We review evidentiary rulings on admissibility of expert or lay witness opinion testimony for abuse of discretion. *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc); *United States v. Knowles*, 889 F.3d 1251, 1255 (11th Cir. 2018). We review for clear error a district court's determination that an identification procedure was not unduly suggestive. *Cikora v. Duggar*, 840 F.2d 893, 896 (11th Cir. 1988). When reviewing a trial court's denial of a motion to suppress, we review factual findings for clear error, construing the facts in the light most favorable to the government, and legal conclusions *de novo*. *United States v. Burgest*, 519 F.3d 1307, 1309 (11th Cir. 2008). Finally, "[t]he cumulative impact of multiple evidentiary and instructional errors [is] reviewed *de novo*." *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

## III.

## A.

Daniels first claims that the district court abused its discretion by failing to admit testimony from his proffered eyewitness identification expert, Dr. Nadja Schreiber Compo. Dr. Schreiber Compo was offered to provide expert testimony on many of the factors bearing on the reliability of eyewitness identification

testimony.   This opinion testimony included her findings that "viewing and encoding conditions were limited and suboptimal," that the perpetrator wore a hood obscuring his face, that cross-racial identification is less reliable, that there was "no recording of the identification procedure," and that the lineup instructions were "incomplete" and "missing several additional safeguards against wrongful identification."   The government moved to exclude Dr. Schreiber Compo's proffered testimony, and the district court agreed, concluding that her testimony would not be helpful to the jury.

Our precedent has long held -- since at least 1982 -- that expert testimony on eyewitness identification is generally disfavored and the district court need not admit it.  *See United States v. Thevis*, 665 F.2d 616, 641 (5th Cir. Unit B 1982) (reasoning in part that "[t]o admit such testimony in effect would permit the proponent's witness to comment on the weight and credibility of opponents' witnesses and open the door to a barrage of marginally relevant psychological evidence" and that cross-examination could "adequately address[]" "problems of perception and memory"),[1] *superseded by statute on other grounds as stated in United States v. Zlatogur*, 271 F.3d 1025, 1028 (11th Cir. 2001); *United States v. Smith*, 122 F.3d 1355, 1358 (11th Cir. 1997) (per curiam).

---

[1]  *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (adopting as binding all decisions issued by a Unit B panel of the former Fifth Circuit).

Since then, in *Smith*, we considered whether the Supreme Court's decision in *Daubert*,[2] which generally addressed the requirements for the admissibility of expert testimony, conflicted with our precedent.  122 F.3d at 1358. Summarizing the relevant case law, we concluded that "our holding in *Thevis* is in accord with *Daubert*," and, thus, we reiterated that "a district court does not abuse its discretion when, after examining the proffered testimony, the court excludes it."  *Id.*  We also acknowledged out-of-circuit "nascent case law more receptive to expert testimony on eyewitness reliability," but we nevertheless recognized that our Court has maintained an "attitude of disfavor" toward this kind of testimony.  *Id.* at 1357–58.[3]

---

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588–92 (1993) (construing FED. R. EVID. 702 to list requirements for admissibility of expert testimony, including requirements that the expert (i) possess "scientific, technical, or other specialized knowledge" that will (ii) "assist the trier of fact to understand or determine a fact in issue").

[3] Daniels asks this Court to ignore its precedent in favor of case authority drawn from the Second and Sixth Circuits, both of which have "recognized the importance of using identification experts to assist juries." *See United States v. Smithers*, 212 F.3d 306, 314–15 (6th Cir. 2000) (finding abuse of discretion where the district court excluded proposed expert testimony without conducting a *Daubert* hearing or applying *Daubert*); *United States v. Nolan*, 956 F.3d 71, 75 (2d Cir. 2020) (concluding the defendant's counsel was ineffective where he did not attempt to challenge the introduction of eyewitness identification despite potential for mistaken eyewitness identifications in the case).  But the prior-panel-precedent rule clearly governs our analysis. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first

Here, the district court faithfully applied our case law and acted well within its discretion in excluding the testimony of Dr. Schreiber Compo.  In its written order granting the government's oral motion to exclude the expert's testimony, the court began by noting that the "Eleventh Circuit has held that the testimony of an eyewitness expert 'is often not helpful to the jury,'" and, thus, that "[t]he binding precedent of the Eleventh Circuit *allows* courts to exclude such eyewitness expert testimony."

The district court then turned to whether it would admit Dr. Schreiber Compo's testimony.  In *Smith*, the district court excluded the defendant's proposed expert testimony on the second prong of *Daubert*, finding that it would not "assist the trier of fact."  *Id.* at 1358.  Here, just as in *Smith*, the district court reviewed the proffered expert testimony, determined that it would not be helpful to the jury, and, "in the exercise of its discretion," concluded that the expert testimony in question "should be excluded."

Moreover, in an abundance of caution, the district court gave the jury four additional instructions highlighting some issues relating to eyewitness identification, including the challenge of cross-racial identification; the degree of attention paid to the facial features of the person; lighting conditions; and whether the

---

panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.").

person's face was obstructed.[4]  *See id.* at 1359 (sanctioning "jury in-
structions that highlight particular problems in eyewitness

---

[4]  The district court's instruction, patterned on the relevant Eleventh Circuit
Pattern Jury Instruction, read this way:

> The Government must prove beyond a reasonable doubt that
> the Defendant was the person who committed the crime.
>
> If a witness identifies a Defendant as the person who commit-
> ted the crime, you must decide whether the witness is telling
> the truth.  But even if you believe the witness is telling the
> truth, you must still decide how accurate the identification is.
> I suggest that you ask yourself questions:
>
> 1.  Did the witness have an adequate opportunity to observe
>     the person at the time the crime was committed?
> 2.  *Did the witness pay attention to the facial features of the person?*
> 3.  How much time did the witness have to observe the per-
>     son?
> 4.  *Were the witness and the person of different races?*
> 5.  How close was the witness?
> 6.  *What was the lighting like at the time of the crime?*
> 7.  Did anything affect the witness's ability to see?
> 8.  *Was the person's face obstructed by a hat, hoodie, or mask?*
> 9.  Did the witness know or see the person at an earlier time?
>
> You may also consider the circumstances of the identification
> of the Defendant, such as the way the Defendant was pre-
> sented to the witness for identification and the length of time
> between the crime and the identification of the Defendant.
>
> After examining all the evidence, if you have a reasonable
> doubt that the Defendant was the person who committed the
> crime, you must find the Defendant not guilty.

recollection"). In addition, on cross-examination, defense counsel elicited testimony raising possible perception or memory weaknesses in the identification, including that the crime happened at nighttime, and that one victim could recall some key points from the evening of the crime, "but not everything." *See id.* (observing that "defendants who want to attack the reliability of eyewitness recollection are free to use the powerful tool of cross-examination to do so").

It's also worth noting that the eyewitness identification -- from the victim, Roman (both from the photo array and an in-court identification) -- was not the only evidence linking Daniels to the crime. Quite the opposite. As we've described, Daniels' identity was corroborated in footage taken from the pawn shop where the victims' jewelry was sold and from the identification card used in the sale; in footage from the tow yard of the crime and Detective Wilson's unambiguous identification of Daniels as the shooter in the footage; and in the telephone numbers saved in both the cell phone recovered from the scene and Daniels' prison phone records.

On this record, we cannot say that the district court abused its considerable discretion in excluding the expert testimony of Dr. Schreiber Compo.

**B.**

---

*See* 11th Cir. Pattern Jury Instructions (Criminal Cases) S3 (emphases added).

Daniels next takes issue with Roman's out-of-court identification of Daniels as the shooter.  This identification occurred just three days after the shooting -- the first day hospital staff believed Roman was sufficiently recovered to speak with law enforcement -- when an officer displayed a black-and-white, six-man photo array to Roman, while he was hospitalized at the Ryder Trauma Center.  Roman immediately identified Daniels, whose photo was third in the array, and told the detective to "[g]et that mother f---ker."  Daniels argues that Roman's identification should have been suppressed on the ground that the photo array displayed to Roman was unduly suggestive because Daniels' photograph was the only one to show a man whose haircut and black hooded sweatshirt with white strings happened to match the hairstyle and clothing worn by the assailant.

The district court found that the photo array shown to Roman was not unduly suggestive.  The court explained its ruling this way:

> The line-up appears to depict six men with similar skin tones and dreadlocks of varying length and size.  Only a small portion of the men's upper body clothing is visible in the photographs.  Two men appear to be wearing a hooded sweater, and two men are wearing sweaters with white drawstrings.  The fact that the individuals in the line-up are not wearing uniform clothing does not render it unduly suggestive.

When determining whether an out-of-court identification was properly admitted, we apply a two-step test.  *United States v.*

*Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).  First, we ask "whether the original identification procedure was unduly suggestive."  *Id.* This inquiry considers "the size of the array, the manner of its presentation, and the details of the photographs in the array." *United States v. Perkins*, 787 F.3d 1329, 1344 (11th Cir. 2015).  If we answer this question affirmatively, we look to the second step, which asks "whether, under the totality of the circumstances, the identification was nonetheless reliable."  *Diaz*, 248 F.3d at 1102*; accord Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).  Whether the identification was reliable under the totality of the circumstances depends on (1) the witness's opportunity to view the accused; (2) the witness's degree of attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty; and (5) the length of time between the crime and the identification.  *Biggers*, 409 U.S. at 199–200.

Here, the district court did not clearly err when it held that the pretrial identification procedure was not unduly suggestive. *See Diaz*, 248 F.3d at 1102.  The photo array included six distinct persons.  *See Perkins*, 787 F.3d at 1344.  The law enforcement officer who presented the array to Roman cautioned that it might not include a photo of the perpetrator, he did not know that Daniels was the suspect when he presented the array, and he read to Roman the standard lineup admonition -- which cautions that hairstyles and facial hair can be changed, and that photos may not accurately depict an individual's complexion -- before showing him the lineup. Furthermore, the array displayed "men with similar skin tones and dreadlocks of varying length and size."  The array was presented in

black and white, which makes the precise color of the clothing difficult to discern. And, significantly, despite Daniels' claim that he was the only one shown in a black hoodie, (i) all but one of the men were wearing clothing that appears to be a sweatshirt or hooded sweater, (ii) three of the men were wearing dark sweaters, and (iii) another man was wearing a dark sweatshirt with white drawstrings.

Daniels directs us to *United States v. Wade*, 388 U.S. 218 (1967), which offered as an example of an unduly suggestive lineup procedure one where only the suspect was required to wear distinctive clothing matching that worn by the culprit. *See id.* at 233. But here, unlike the example in *Wade*, Daniels was not *"required"* to wear a certain hoodie or outfit. *See id.* (emphasis added). In fact, Detective Wilson confirmed at trial that he found Daniels "already wearing this hoodie" when he asked Daniels if he could take Daniels' photo. Moreover, as we've noted, several of the other men photographed in the lineup wore similar clothing. And, in any event, under our case law, even if Daniels were the only person in the array wearing a black hoodie or with a certain hairstyle, that does not necessarily mean that the lineup was unduly suggestive. *See, e.g.*, *Perkins*, 787 F.3d at 1344 (finding no clear error in the district court's conclusion that a lineup was not unduly suggestive where the defendant was the only person displayed with gold teeth, which was a distinguishing feature because the array otherwise included photos of "men who appeared to be roughly the same age and who had similar facial features and similar hair length"); *United States v. Smith*, 967 F.3d 1196, 1203–04 (11th Cir.

2020) (finding no clear error in the district court's conclusion that a lineup was not unduly suggestive even where the defendant was the only man in the array with two-toned dreadlocks, a "distinctive physical characteristic"). In this case, because the photo array consisted of men with sufficient similarities in appearance, including hairstyle, complexion, and dress, we cannot say that the lineup Roman reviewed was unduly suggestive.

But even if the district court had clearly erred, the identification itself was "nonetheless reliable" when looking at the "totality of the circumstances" under step two of the inquiry. *See Diaz*, 248 F.3d at 1102. For starters, Roman had directly seen the shooter and told him to "get out of the [tow] yard," before the shooter "took out the pistol," aimed it at Roman, and shot him. In addition, Roman expressed a high level of certainty in making this identification. According to the detective who delivered the photo lineup, when Roman saw the third photograph in the array (which pictured Daniels), he said, "This is the person that shot and robbed me," and asked the detective to "[g]et that mother f---ker." Additionally, very little time elapsed between the crime and the identification. Only three days had passed, and Roman identified his assailant at the earliest moment that he could have done so because, until that point, hospital staff had prevented Roman from speaking to law enforcement. Finally, we repeat that Roman again unambiguously identified Daniels as the assailant in court.

Put simply, even if the lineup were unduly suggestive -- and we can discern no clear error in the district court's findings -- the

totality of the circumstances plainly supports a determination that Roman's identification of Daniels was "nonetheless reliable." *See id.*

## C.

Daniels next claims that the district court abused its discretion when it allowed Detective Wilson to testify that he had "immediately identified" Daniels as the shooter upon review of the surveillance footage. According to Wilson, "[t]he video is clear as day as far as [Daniels] running with the firearm, and, you know, approaching the camera, you clearly see his facial features, his entire face on video." Detective Wilson added that when he told his supervisors that the shooter was Thomas Daniels, he was "100 percent" certain in his identification.

Daniels first argues that the admission of Detective Wilson's testimony violated Federal Rule of Evidence 701, which governs admission of lay opinion testimony. The Rule provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.  Daniels offers that Detective Wilson's testimony identifying Daniels as the shooter in the video footage would not be "helpful" to the jury because the jury was just as capable to identify Daniels in the video.

However, a district court does not abuse its discretion by admitting witness testimony where the witness has "a greater appreciation of [the] defendant['s] normal appearance." *United States v. Pierce*, 136 F.3d 770, 774 (11th Cir. 1998) (internal quotation marks and citation omitted).  In fact, "lay opinion identification testimony may be helpful to the jury where . . . there is some basis for concluding that the witness is more likely to correctly identify the defendant" from photograph or video evidence than is the jury.  *Id.* (internal quotation marks and citation omitted).  "[C]ritical to this determination is the witness's level of familiarity with the defendant's appearance." *Id.*  Thus, where a witness has developed "firsthand knowledge of [a defendant's] appearance outside the courtroom setting," the witness may have greater familiarity with the defendant's appearance than would the jury. *United States v. Ware*, 69 F.4th 830, 850–51 (11th Cir. 2023), *petition for cert. filed* (U.S. Nov. 2, 2023) (No. 23-5946).

Detective Wilson's identification of Daniels was "helpful" within the meaning of Rule 701 because Detective Wilson had "greater appreciation" of Daniels' appearance and was "more likely to correctly identify" Daniels in the video surveillance footage than was the jury. *Pierce*, 136 F.3d at 774 (citations omitted).  As we've already observed, due to his years of community involvement,

Detective Wilson knew Daniels, Daniels' brother, and other people with whom they hung out. Moreover, Detective Wilson demonstrated his familiarity with Daniels when he was tasked with obtaining an updated photograph of Daniels for the photo array -- Detective Wilson knew where Daniels was likely to hang out, and, from his patrol vehicle, he identified Daniels on the street in a "hoodie with his head slightly down" upon seeing only "the side of his facial features walking inside of the store."

At bottom, Detective Wilson's testimony and conduct thoroughly reflected his "familiarity" with Daniels. *See id*. Although the jurors were free to observe Daniels for themselves in the "sterile, one-dimensional atmosphere of the courtroom," *United States v. Contreras*, 536 F.3d 1167, 1171 (10th Cir. 2008), and then to compare his appearance to the shooter in the video footage, record evidence suggested that Daniels had changed his appearance over the years, and even between the time of the crime and his arrest, *see Ware*, 69 F.4th at 850–51. Thus, as we see it, Detective Wilson's years of interactions with Daniels likely placed the detective in a better position to make an identification, and the district court did not abuse its discretion in admitting this testimony. *See Pierce*, 136 F.3d at 774–75.

Daniels next says that the admission of Wilson's testimony violated Federal Rule of Evidence 403. Under this Rule, a court may exclude admissible evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." FED. R. EVID. 403. We

have cautioned that, where a witness's identification "highlight[s] the defendant's prior contact with the criminal justice system," there is a greater risk of unfair prejudice. *Pierce*, 136 F.3d at 776; *accord Knowles*, 889 F.3d at 1257 (finding no unfair prejudice where agent's identification testimony "did not reveal any past or collateral contact . . . with the criminal justice system"). Daniels claims that he was unfairly prejudiced because Wilson's testimony suggested that Daniels had past exposure to the criminal justice system, and the jurors might have inferred that Daniels had been arrested earlier or was otherwise involved in prior law enforcement investigations.

But on the record before us, we cannot say that Detective Wilson's testimony unfairly prejudiced Daniels, or that the district court abused its discretion in admitting the testimony. Notably, rather than discussing Daniels' prior arrests or any other entanglement with the criminal justice system, Wilson testified that he had seen Daniels over many years through his practice of casual interactions with people he met in the neighborhood, highlighting that he knew Daniels through his community involvement as a patrol officer. Based on these explanatory remarks from Detective Wilson, we cannot conclude that the jury drew an unfair inference from this testimony. *See Knowles*, 889 F.3d at 1257.

Finally, we are unpersuaded by Daniels' argument that Detective Wilson's identification testimony was cumulative under Rule 403 because Roman's identification of Daniels had already been introduced, so Detective Wilson's testimony identifying

Daniels was "needless." For one thing, Rule 403 grants a district court broad discretion to admit testimony. *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1291 (11th Cir. 2014). And importantly, Detective Wilson's testimony -- in which he identified Daniels from the surveillance footage -- was distinct from the identification that Roman had made as an eyewitness. Furthermore, Wilson's testimony was particularly useful in rebutting the defense's challenge to the strength of the identification Roman had offered -- namely, that Roman's identification should not be afforded much weight because it occurred the day after Perez was shown a different photo array and used a different photograph of Daniels. As a result, the identification by Detective Wilson both was probative and had little cumulative impact.

## D.

We turn next to Daniels' claim that the district court improperly denied his motion to suppress the photos Detective Wilson had taken of him outside the M&M Food Market in Florida City. Daniels claims that he was unlawfully seized in violation of the Fourth Amendment "when Detective Wilson approached [him] and told him that he needed to talk to him" because there was no warrant, and because Detective Wilson did not have reasonable suspicion or probable cause.

The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. A court must analyze the totality of the circumstances when determining whether a search and seizure is reasonable

under the Fourth Amendment. *See Samson v. California*, 547 U.S. 843, 848 (2006). There is probable cause to effect a seizure where "the facts and circumstances within the officer's knowledge, of which he or she has reasonable trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (internal quotation marks and citation omitted). Determinations of probable cause are afforded "great deference." *United States v. Delgado*, 981 F.3d 889, 898 (11th Cir. 2020).

Here, the district court found that "Detective Wilson had reasonable suspicion and probable cause" "[r]egardless of whether Daniels was seized." We agree.[5]

Indeed, by the time Detective Wilson located Daniels at the food market, Detective Wilson had already "immediately identified" Daniels as the shooter shown in the surveillance footage taken from the tow yard. Wilson also saw Daniels walk into the store wearing the same or a similar hoodie as had been worn by the shooter. A reasonable officer in Detective Wilson's circumstances and possessing the same knowledge could have concluded that there was probable cause to arrest Daniels. Since there was probable cause to arrest, there was no constitutional violation in the encounter between the two men. The photos were not the

---

[5] Although the Government also argues that the encounter was consensual, we decline to decide this question because the district court did not make a factual finding about whether the encounter was consensual.

"fruit" of an unlawful seizure because the photos were a result of an encounter where the officer had probable cause to arrest.  *See United States v. Timmann*, 741 F.3d 1170, 1183 (11th Cir. 2013).

As for Daniels' claim that the photos must be suppressed anyway because Wilson tricked him into thinking that he would be exonerated if he complied, police deception does not "invalidate a search that is objectively reasonable."  *See United States v. Spivey*, 861 F.3d 1207, 1215 (11th Cir. 2017).  Nor does Detective Wilson's belief that the encounter was "consensual" preclude a finding that the government had probable cause to arrest.  *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 507 (1983) (noting that even if officers had "proceeded on a consensual or *Terry*-stop rationale," the government was not "foreclose[d] . . . from justifying" an arrest "by proving probable cause").

Finally, Daniels claims that the cumulative impact of the errors deprived him of a fair trial and requires reversal.  We "reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial."  *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014).  But the whole here is no greater than the sum of its parts.  There was no error for the reasons we have discussed, nor was there cumulative error.

**AFFIRMED.**