[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10941

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARICAS RONDELL TAYLOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cr-00357-KKD-SMD-1

_____

Before JILL PRYOR, BRASHER, and ANDERSON, Circuit Judges.

PER CURIAM:

Maricas Taylor appeals his conviction and 180-month sentence for knowingly possessing, as a felon, ammunition in and affecting interstate and foreign commerce. *See* 18 U.S.C. § 922(g)(1). Taylor argues that the district court plainly erred in failing to *sua sponte* strike Jasheena White's out-of-court and in-court identifications of him as the person who shot at her on the grounds that the identifications were unduly suggestive and unreliable. Taylor also argues that his 180-month sentence is substantively unreasonable because the court failed to consider all the 18 U.S.C. § 3553(a) factors and erroneously denied his requested downward variance. Having thoroughly reviewed the record, we affirm.

## I.

A grand jury indicted Taylor on one count of possessing, as a felon, ammunition in and affecting interstate and foreign commerce. He pleaded not guilty.

At trial, Jasheena White testified that, on September 30, 2022, she was working as a cashier at Petro Mart in Montgomery. Around 8:00 a.m., Taylor arrived with Nicopa, his cousin. Although Nicopa was a regular at Petro Mart, Taylor was not, and White did not know Taylor. Taylor was wearing a blue, black, and white Carolina Panthers hat, an orange U.S. Foods shirt, navy blue pants, and white Nike Air Max tennis shoes.

As Taylor entered the store, Nicopa asked him to get her a cigar and a lighter, which White rang up. White told Taylor the price, and Taylor responded by asking White why his cousin—who had been banned from Petro Mart—was not allowed inside the store. White said that Taylor should ask his cousin that question. Taylor responded, "I'm asking you." White repeated the price of the cigar and the lighter.

Taylor asked White "what the fuck [she was] looking at." White responded, "these my eyes, I'm grown, and you know what? You talk too fucking much. Get the fuck out the store. I'm not serving you." White then voided the transaction. Taylor began calling White and her coworker "bitches and hoes" and said, "I bet you won't come out of the store, bitch." White responded that she was not scared of Taylor. Taylor turned to Nicopa, said that he was not afraid of a "bitch with no gun," and looked at White.

During the exchange, Taylor was standing about six feet away from White, and White purposefully scanned Taylor's "body figure, what he [had] on, how he look[ed], his eyes, [and] his nose." White smelled alcohol on Taylor's breath and noticed that his eyes appeared bloodshot. Taylor left the store seven minutes after he had entered.

The government played a video of a portion of the exchange between White and Taylor. The soundless video shows a black male inside the store wearing a black hat with a blue brim, an orange shirt, and dark pants. The man approaches the door of the store and waves to someone outside. A black female approaches

the entrance to the store and stands in the threshold to the man's left. A person working behind the counter partially comes into frame. The male begins pointing and waving his hand. As he points, a small white marking or logo is visible on the back of his pants. At one point, the male appears to point at the person standing behind the counter. White testified that she was the person behind the counter, Taylor was the man, and Nicopa was the woman to his left.

Approximately 30 minutes after White's exchange with Taylor, he reentered the store. White did not see the moment Taylor entered because a customer had asked her for change and she was bent over the register, but she stood back up after hearing the doorbell. White saw Taylor standing about six feet from her, wearing the same blue pants and Carolina Panthers hat he had worn in the initial exchange, but now wearing khaki work boots, a black zip-up hoodie with the hood pulled over the hat, and a disposable mask that covered his mouth and nose.

White could still see Taylor's eyes—which looked bloodshot—and she knew the hat was the same one he had been wearing because he was "standing . . . directly in front of [her]." White could also see that Taylor was wearing the same orange shirt under his hoodie. White looked at Taylor and said "[o]h, you back?" Taylor then reached to his right and pulled out a gun. White dove to the floor and Taylor shot at White, who avoided the shot.

The government played a video of the shooting. The video shows a figure wearing a disposable mask, a dark hoodie with the

hood pulled over his head, tan boots, and dark pants enter the store and stand a few feet away from the counter with his back to the camera. After a few seconds, the figure reaches into his waistband and pulls out a gun. As the figure reaches for the gun, he lifts the bottom of his hoodie, and a small white marking or logo is visible on the back of his pants. The figure then aims at a person standing behind the counter, the person ducks, and the figure fires. The figure then fires a second shot and continues aiming the gun before lowering it and exiting the store. White testified that Taylor was the shooter in the video and that she was the person behind the counter. From the time Taylor reentered the store until he left, he said nothing to White.

After the shooting, Detective Shannon—an officer White knew from his previous work on her deceased husband's case—gave her a "mug shot picture" of Taylor. White reviewed Detective Shannon's photo of Taylor "to identify [Taylor] to get his correct name to sign [a] warrant." White began posting pictures and videos of the shooting to Facebook. One of her posts included a photo of Taylor and said "[t]his is the man that tried to kill me. His name is Reek Taylor." White testified that the photo Detective Shannon gave her was "how [she] was able to get [Taylor's] name."

On October 7, 2022, White participated in a photo lineup identification led by Agent Julius Porter. In an audio recording of the lineup, an officer tells White that he will present her with "a list of 10 random people" and directs White to "see if [she can] identify [the shooter]." The officer informs White that the shooter may or

may not be on the page but tells White to circle the photo of the shooter if she sees him. After a few seconds, White says, "it's him . . . that's him with weight."

The officer asks White how confident she is that the man she identified is the shooter, and she responds, "very, because I got pictures . . . in my phone and I done looked at this negro too many times; this is him with weight on him. That's the first mugshot Detective Shannon sent me." The officer asks "oh, so he sent you a mugshot of him?" and White responds that Detective Shannon had asked her, "is this him? Is this him with weight on him?" The officer asks White whether she had ever seen the suspect "without . . . weight on him," and White responds, "yeah . . . he's not that big . . . this is the most recent picture of him." White says she "sent it" to Detective Shannon. After a pause of a few seconds, the officer asks, "so that's what Detective Shannon sent you?" and White responds, "hmm-hmm, and this is what I sent him. . . . This is him today." The government presented an exhibit to the jury that showed a photo lineup with Taylor's photo circled and White's signature, dated October 7, 2022.

On redirect, White testified that the shooter had the same build as Taylor, stating that she was "[100] percent confident" the person she had argued with earlier was the same person who shot at her. She also explained that the orange shirt under the hoodie was not the only reason she believed the shooter was Taylor and cited the shooter's Carolina Panthers hat and bloodshot eyes.

Agent Porter testified that he was present during a police interview with Taylor and that, after the interview, Taylor changed clothes and police took custody of the ones he had been wearing. Taylor's pants had a white Cintas logo which appeared to match the logo visible on the pants worn by the shooter in the surveillance footage.

On cross-examination, Agent Porter testified that he believed Detective Shannon worked at the district attorney's office but that he had never worked with Detective Shannon. Agent Porter did not know that Detective Shannon had provided White a photo of Taylor at the time of the photo lineup. Porter also testified that he had never shown a witness a mug shot of a person before presenting them with a photo lineup that included that person and acknowledged that such a procedure could possibly bias a witness.

Taylor called cognitive psychologist Dr. Jeffrey Neuschatz as an expert witness. Dr. Neuschatz testified on factors that affect eyewitness identification, including exposure time, the length of time between the event and the identification, the information a witness collects after the event, the stress of the event witnessed, and the presence of bystanders in a lineup who were also present when the event occurred. He also testified that the best practice for lineups is to ensure that the person conducting the lineup does not know the identity of the suspect, ensure the witness identifying the suspect does not know the identity of the suspect, instruct the witness that the person may or may not be in the lineup, ensure innocent people who look similar to the suspect are in the lineup, and

obtain a confidence statement from the witness immediately after the identification.

The jury found Taylor guilty of Count One.

In his presentence investigation report, a probation officer determined that Taylor's base offense level was 33 because his offense involved assault with intent to commit murder or attempted murder and the object of Taylor's offense would have constituted first degree murder. *See* U.S.S.G. §§ 2A2.1(a)(1), 2K2.1(c)(1)(A). The probation officer calculated Taylor's criminal history category as III, citing his adult criminal convictions for murder and attempted murder and for second-degree assault on an officer. Accordingly, Taylor's guideline imprisonment range was 168 months to 210 months, which the probation officer adjusted to 168 months to 180 months to reflect the statutory maximum sentence for his offense. The probation officer did not identify any factors that would warrant a variance or a departure.

Taylor objected to the PSI's calculation of his base offense level using U.S.S.G. section 2A2.1(a)(1), arguing that there was insufficient evidence to conclude that he possessed intent to kill White and that applying section 2A2.1(a)(1) would require the court to make factual findings unsupported by the evidence and not contemplated by the jury. Taylor also contended that a downward variance to 120 months would be appropriate because his total offense level of 33 overstated the seriousness of his offense. Specifically, Taylor "reject[ed] any notion that he intended to kill . . . White," arguing that, although the video depicted the assailant

shooting in White's direction, White was not hit even though the assailant was only feet away from her.

At sentencing, the district court found "that the guideline ha[d] been appropriately calculated" since "the evidence more than supports that [Taylor] went in [the store] to kill [White]" and that "[h]e shot right at her." The court stated that Taylor was being sentenced "for the conduct that we held a trial about," that "there's no doubt . . . that [Taylor was] the person that came back in [the store] and tried to kill [White] that day," and that Taylor chose to behave how he did and "almost took [White's] life." Noting Taylor's violent history, including his adult criminal convictions for murder and attempted murder and for second-degree assault on an officer, the court described Taylor as a "danger to society."

The court sentenced Taylor to 180 months' imprisonment followed by 5 years of supervised release. In announcing the sentence, the court stated that it had "considered the guidelines and the reasonableness of [the] sentence under [the] 3553(a) factors." [*Id.*] The court added that, even if it had not calculated the guidelines correctly, it would still find the sentence imposed reasonable. Taylor objected to the sentence "on procedural and substantive reasonableness grounds."

Taylor appealed.

## II.

We review matters not raised before the district court for plain error. *United States v. Madden*, 733 F.3d 1314, 1319 (11th Cir.

2013). "Plain error occurs where (1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Hall*, 314 F.3d 565, 566 (11th Cir. 2002).

We review sentencing decisions for abuse of discretion. *United States v. Irey*, 612 F.3d 1160, 1188 (11th Cir. 2010) (en banc). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id*. at 1189 (quotation marks omitted). We review the factual findings of a district court at sentencing for clear error. *United States v. Cruz*, 713 F.3d 600, 605 (11th Cir. 2013).

## III.

Taylor makes two arguments. First, he argues that the district court plainly erred in failing to *sua sponte* strike White's out-of-court and in-court identifications of him on the grounds that they were unduly suggestive and unreliable. Second, he argues that his 180-month sentence is substantively unreasonable because the district court failed to consider all the section 3553(a) factors and erroneously denied his requested downward variance. We take each in turn.

*A.*

"This Court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification." *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001). First, we assess "whether the original identification procedure was unduly suggestive." *Id.* If so, we "must consider whether, under the totality of the circumstances, the identification was nonetheless reliable." *Id.* Evaluating the reliability of an identification involves assessing "(1) the eyewitness's opportunity to view the suspect; (2) her degree of attention; (3) the accuracy of her description; (4) her level of certainty; and (5) the length of time between the crime and her identification." *United States v. Caldwell*, 963 F.3d 1067, 1075 (11th Cir. 2020) (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)). Here, regardless of whether the original identification procedure was unduly suggestive, it was reliable under the *Biggers* factors.

The first factor—White's opportunity to view the suspect—weighs in her favor. Although Taylor notes that the shooter's facial features were obscured by a mask and that the shooter was in the store for only a few moments before the shooting, White testified that she had the opportunity to "look[] at [the shooter]" and recognize him as Taylor based on his build, clothing, and bloodshot eyes. Moreover, as White testified and the surveillance footage substantiated, the shooter was standing only about six feet from White. This "close visual contact" with the shooter, even for a few

seconds, was sufficient to give White an adequate opportunity to view him. *See Caldwell*, 963 F.3d at 1075.

The second factor—White's degree of attention—also weighs in her favor. White had a high degree of attention toward the shooter, as evidenced by her detailed descriptions of his appearance and her testimony that she recognized and spoke to him, saying "[o]h, you back?" Furthermore, although Taylor argues that there is no way to determine whether White's descriptions stemmed from her memory of the event or from her access to surveillance footage, White offered several descriptions of the shooter that were not clearly visible on the footage, including the shooter's bloodshot eyes, Carolina Panthers hat, and orange shirt under his hoodie.

The third factor—the accuracy of White's descriptions—is supported by surveillance footage, the clothing recovered from Taylor after his police interview, and testimony from Agent Porter. *See Caldwell*, 963 F.3d at 1075. The footage of the argument between Taylor and White shows that Taylor wore clothes like those White described, including an orange shirt, dark pants, and a black and blue hat. It also shows that the *shooter* wore clothes like those White described, including a dark hoodie with the hood pulled up, tan boots, and dark pants, and it substantiates White's testimony that Taylor and the shooter wore the same pants because a white logo or marking is visible on the back of Taylor's pants and the shooter's pants. Moreover, Agent Porter testified that the pants

recovered from Taylor after his police interview appeared to have the same white logo visible in the surveillance footage.

The fourth factor—White's level of certainty in her out-of-court identification—must be evaluated at the time it was made. *See Manson v. Brathwaite*, 432 U.S. 98, 114–15 (1977). At the lineup, White stated that she was "very" confident that Taylor was the shooter "because [she had] pictures . . . in [her] phone" of Taylor that she had seen many times and recognized him from "the first mugshot Detective Shannon sent [her]." White's statement here implied that she was confident that she recognized Taylor from his photos rather than from her recollection of the crime. Thus, because White did not clearly specify how certain she was that she recognized Taylor from the crime, this factor neither supports nor undercuts the reliability of White's identification.

Finally, the fifth factor—the length of time between the crime and Taylor's identification—was seven days: the shooting occurred on September 30, 2022, and the photo lineup occurred on October 7, 2022. Although a quicker identification would have been optimal, this did not amount to the passage of weeks or months that would call the reliability of her identification into question. *See Manson*, 432 U.S. at 115–16; *see also United States v. Daniels*, 97 F.4th 800, 810–11 (11th Cir. 2024).

The *Biggers* factors—apart from the fourth, which neither supports nor undercuts White—largely weigh in favor of White. Accordingly, we cannot say that the district court committed plain error in failing to *sua sponte* exclude the identifications.

*B.*

Taylor's second argument—that his 180-month sentence is substantively unreasonable because the district court failed to consider all the section 3553(a) factors and erroneously denied his requested downward variance—is similarly unavailing.

We begin with the factors. Section 3553(a) requires a sentencing court to consider, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(1)–(2). Section 2X1.1 of the Sentencing Guidelines, in turn, provides that the base offense level of an attempt is "[t]he base level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1.

Here, before shooting at White, Taylor had two previous adult felony convictions that supported the district court's finding that Taylor was a "danger to society." Those felony convictions included murder and second-degree assault on an officer. Furthermore, the circumstances of Taylor's offense were particularly severe, given that he pointed a gun at White and fired two shots

during the offense. Accordingly, based on the section 3553(a) factors—namely, "the nature and circumstances of [Taylor's] offense," his "history and characteristics," and the need to "protect the public" from Taylor's conduct—we cannot say that the district court abused its discretion in imposing a sentence at the upper limit of the guideline range. *See Johnson*, 803 F.3d at 618.

We now turn to Taylor's requested downward variance. Taylor argues that the downward variance was warranted because the evidence did not suggest that he intended to kill White instead of merely scare her. But based on White's testimony and the surveillance footage showing that Taylor shot twice in White's direction, it was not clearly erroneous for the district court to find that "the evidence more than supports that [Taylor] went in [the store] to kill [White]." *See United States v. Cruz*, 713 F.3d 600, 605 (11th Cir. 2013). As a result, we cannot say that the district court abused its discretion in declining Taylor's request for a downward variance.

## IV.

The district court court's judgment is **AFFIRMED**.